In the Matter of the Estate of LUCY P. DISBROW, Deceased.

Surrogate's Court, Queens County, November 18, 1932.

*Kelley & Becker*, for legatee Thomas A. Disbrow.

*Austin, Austin, Wooley & Du Pont*, for the accountant executors.

*John Kindred Gillette*, special guardian.

HETHERINGTON, S. The decedent died on January 15, 1930, leaving a last will and testament which was admitted to probate on February 6, 1930. On the same day letters testamentary were issued to her sons Joseph P. and Charles C., who filed their intermediate accounting as such on January 4, 1932. Objections have been made thereto by the special guardian for two infant legatees and by Thomas A. Disbrow, a son and legatee of the decedent. The objections of the latter are directed chiefly to certain payments made by the executors for charges against realty, losses sustained on the sale and by the retention of securities, premature and preferential payments to certain legatees, and improper allowance of claims against the estate. Upon the hearing the objector was given leave to amend his objections to the extent of including therein a request to have the court determine whether

or not the testatrix intended to charge the payment of the legacies on her realty. The general rule is that real estate is not charged with the payment of legacies unless the intention so to do is either expressly declared or can fairly and satisfactorily be inferred from the language and disposition of the will. Here the testatrix has failed to expressly declare that the legacies should be charged on the land. Can any such intention be inferred? The will was executed on December 19, 1928, and after directing payment of her debts and funeral expenses, the testatrix gave six cash bequests in the following amounts: To her daughter Lucy G., $35,000; to her son Charles C., $15,000; to her son Louis A., $10,000; to her son Thomas A., $10,000; and to two grandchildren $1,000 each. The balance of her residuary estate was given absolutely to her six living children. She expressly stipulated that Lucy's legacy was to be satisfied first, followed by that of Charles, and as to the others she indicated no preference. No trusts or intermediate estates were created. Strangers were not the objects of her bounty. She made a plain and simple distribution of her estate. Her executors were directed to pay her debts and the legacies mentioned, and the rest she gave absolutely to her children. A material consideration in determining her intent is the nature and composition of her estate at the time of the making of the will. The account discloses a net personal estate at the time of her death in excess of $90,000. Testimony was given upon the hearing that her personal estate at the time of making the will was about $10,000 less than at the time of death. Her estate consists chiefly of personalty and a single parcel of real estate. At the time of making the will her personal estate was more than adequate to pay the legacies mentioned therein. The existence of the foregoing factors coupled with a lack of express intention to charge the legacies on the land, lead me to conclude that they are payable solely out of her personal estate. Except for a mere power of sale, the will imposed no duties on the executors with regard to her realty. In the absence of a devise to them in trust or an express direction in the will authorizing the payment of the mortgage, the executors had no right to deal with the real property. The management, control and payment of the charges against the realty belonged exclusively to the devisees. (Real Prop. Law, § 250.) The executors, therefore, cannot claim or take a credit for the payment out of the personal estate of the items of real estate expenses set forth in Schedule " C " amounting to $2,371.75 and the second mortgage of $3,000. Similarly, the unpaid claim of J. P. Disbrow set forth in Schedule " D " 11 for $326, representing interest paid by him on the aforesaid mortgage, must be disallowed.

The major portion of the testatrix's estate consisted of securities. In common with other estate of similar complexion now being accounted for, the securities retained by these executors show a considerable shrinkage in value. The objector, claiming that the executors were grossly negligent in failing to dispose of them at a time when little or no loss would have been sustained by the estate, seeks to surcharge them with the difference between their now reported value and that which might have been realized on a sale made within five months after their qualifying. The executors in justification of their action offered proof that on the advice of those familiar with market and business conditions, they were advised not to sell, and further that the adult legatees, including the objector, agreed that the securities should be held pending a recovery of prices. Testimony was given that, shortly after the death of the decedent, a family conference was held, at which the objector was present, whereat it was agreed that liquidation was inadvisable and that their common interests dictated that the securities should be held for an upward turn in prices. During the early administration of the estate, the wisdom of this course seemed to be established. However, in July, 1930, a reaction set in, prices tumbled and a sharp decline ensued. These executors in common with others believed and were even advised that the condition was temporary and that the market would recover. The most that can be charged to them is an error of judgment, and for which they are not answerable. Furthermore, I am satisfied that independent of the written agreement to which the objector was not a party, the testimony established acquiesence in and lack of protest to their retention by the objector.

At the time of decedent's death, one of the executors maintained a marginal securities trading account in his own name. Among the securities in the account were 400 shares of Anaconda Copper Company stock and six shares of American Tobacco Company B stock, which belonged to the decedent. On January 15, 1930, the date of death, these securities had a market value of $30,595. The remaining securities amounted to $11,070. The loan against all of them amounted to $8,122.98, leaving an equity of $33,543.02. On April 9, 1930, 200 shares of Anaconda stock were sold at $75\frac{1}{4}$ and $15,006 realized therefrom. The following day, a purchase of a like number was made at $75\frac{5}{8}$ at a cost of $15,165. On April 14, 1930, 200 shares of this stock were sold at $70\frac{1}{8}$, the proceeds of which amounted to $13,986. On the same day another lot of 200 shares was sold at $70\frac{7}{8}$ and brought $14,136. Thereafter and between May 6, 1930, and November 19, 1931, over fifty purchase and sale transactions were had in this stock. The final transaction

was had on November 19, 1931, when 400 shares were sold, 200 at 15½ and a like number at 15⅛. The total proceeds amounted to $6,067. The appraised value of the stock as of the date of death was $29,350. The executors take a credit for the difference amounting to $23,283. In the account no mention is made of any sale other than those of November 19, 1931. All the transactions had in this stock subsequent to the initial sales of April 9 and April 14, 1930, were pure speculations and as such beyond the powers of legal representatives to indulge in. It was the duty of the executors to withdraw the proceeds from the trading account immediately after the initial sales. The subsequent transactions cannot be regarded as made for the account of the estate. It is necessary, however, to point out that all the transactions on this stock were had by Joseph P. Disbrow and that his co-executor did not learn of them until the sale immediately previous to those of November 18, 1931. There is no evidence that he assented to them. These factors coupled with the fact that Joseph P. Disbrow had exclusive control and direction of his mother's investments for many years prior to and which continued after her death, leads me to conclude that the surcharge should be restricted to him, and he will, therefore, account to the estate for the sum of $28,992, representing the proceeds of the sales made on April 9 and April 14, 1930.

Among the claims allowed by the executors, although unpaid, is that of Hans J. Skow for $1,116.32. The testimony of the executor regarding its nature is neither certain nor convincing. In fact, he knew very little about it. He did not even exact the customary verified proof of claim. Part or all of it may be barred by the Statute of Limitations. No proper investigation has been made to sustain its validity. It cannot be allowed as against the objectors. The claim of J. P. Disbrow for $3,879.34, which has also been allowed but unpaid, must be disallowed. If the executor chose to advance funds of his own to pay one of the legatees, his remedy is against the legatee unless it appears that the legatee is still entitled to receive a sum equal to or in excess of the payment. The payments made to Joseph P. Disbrow and Douglas A. Disbrow, residuary legatees, cannot be sanctioned until all the general legacies have been paid. The payment in full of Louis A. Disbrow's legacy and the payments made to Charles Cooper Disbrow prior to the satisfaction of Lucy's preferred legacy, are likewise prejudicial to the rights of the objectors and cannot be approved unless there is sufficient to satisfy the cash bequests in full. Interest should be added to all proper payments made on account of legacies, prior to the expiration of the executorial year. In accordance

with the foregoing conclusions, the objections of the special guardian are sustained and those of Thomas A. Disbrow disposed of as follows: Objections " first," " fourth," " fifth," " seventh," " eighth," " ninth," " tenth," " eleventh," " twelfth," " thirteenth," " fourteenth " and " fifteenth " are sustained, and the remainder are overruled.